Harry E. Wedewer, DC Bar No. 975819
Lead Counsel
hwedewer@cftc.gov
(202) 418-5189
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
K. Brent Tomer, NY Bar No. 4404489
ktomer@cftc.gov
(646) 746-9738
Commodity Futures Trading Commission
290 Broadway, 6th Floor
New York, NY 10007
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No: |
| Plaintiff, | |
| v. | COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS |
| ROBERT L. ADAMS AND SIMTRADEPRO INCORPORATED, | |
| Defendants. | |
| | JURY TRIAL DEMANDED |

## I.    SUMMARY

1.    Defendants Robert L. Adams and SimTradePro Incorporated ("SimTradePro")

operated what purported to be "The #1 Premium Investor Community" through "investment clubs" formed for the primary purpose of trading leveraged foreign currency exchange ("forex") such as the British Pound, Japanese Yen, and Euro, along with leveraged gold and silver. In fact, the clubs were commodity pools, unlawfully operated and advised by Defendants, that became vehicles for Defendants to mislead customers: from at least February 2018 to at least April 2019 ("Relevant Period"), Adams, through at least six commodity pools formed and operated by a company Adams controlled, SimTradePro, defrauded more than 100 U.S. customers out of at least $2.3 million.

2.    Defendants' fraud had two elements: (i) material misrepresentations and omissions to customers regarding introducing broker ("IB") fees that were withdrawn from customers' funds without their authorization or knowledge; and (ii) material misrepresentations and omissions to customers regarding leveraged gold trading losses including the reasons for these losses, and Defendants' role in closing-out these trades that locked-in customers' losses without consulting them.

3.    Using the means or instrumentalities of interstate commerce, Defendants operated the pools and solicited or accepted at least $2.3 million from non-eligible contract participant customers to trade leveraged forex and leveraged metals, while also for compensation or profit, advising the pools as to the value of or advisability of trading in these products. Defendants did this without being registered with Plaintiff as a commodity pool operator ("CPO") or as a commodity trading advisor ("CTA").

4.    Defendants' conduct violated two sections of the Commodity Exchange Act ("Act") and a section of the Commission's Regulations ("Regulations") promulgated thereunder:

(i)    By acting as an unregistered CPO and CTA, Defendants violated Section

4m(1) of the Act, 7 U.S.C. § 6m(1);

      (ii)    By committing fraud while acting as a CPO and CTA and using the means or instrumentalities of interstate commerce, Defendants violated Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B); and

      (iii)    By advertising to their customers as a CPO and CTA without making the required disclosure regarding the performance of simulated or hypothetical trading results, Defendants violated Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2023).

5.      Further, Adams violated Section 4k(1) of the Act, 7 U.S.C. § 6k(1), by acting as an unregistered associated person ("AP") of an IB.

6.      Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel compliance with the Act, and to further enjoin Defendants from engaging in any commodity-related activity.

7.      In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including but not limited to, trading and registration bans, disgorgement, rescission, restitution, pre-judgment and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

8.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint, or similar acts and practices, as more fully described below.

9.      The Commission and Defendants have entered into a series of tolling agreements that tolled the statute of limitations beginning on October 4, 2022, and that expired on July 1, 2024.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345, which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1, provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief and to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

11.     The Commission has jurisdiction over the conduct and transactions at issue in this case pursuant to Sections 2(c)(2)(C) and 2(c)(2)(D) of the Act, 7 U.S.C. §§ 2(c)(2)(C), 2(c)(2)(D).

12.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants transact business in this District and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District.

## III.     PARTIES

### A.     Plaintiff

13.     Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2023).

**B.      Defendants**

14.      Defendant Robert L. Adams is a resident of Bandon, Oregon, and is the principal and controlling person of SimTradePro and at least six investment clubs that SimTradePro operated.  Adams has never been registered with the Commission in any capacity.

15.      Defendant SimTradePro Incorporated was an Oregon corporation registered with the Oregon Secretary of State on May 1, 2015, by Adams as its incorporator and registered agent.  SimTradePro listed as its mailing address Adams' address in Bandon, Oregon. SimTradePro has never been registered with the Commission in any capacity.

**C.      Other Relevant Entities**

16.      Victory Investment 2 LLC ("VI2") was a purported investment club registered with the Oregon Secretary of State on February 22, 2017, by Adams as its organizer and registered agent.  VI2's articles of organization identified it as a manager-managed company with Adams as the manager.

17.      Tier Three LLC ("TT") was a purported investment club registered with the Oregon Secretary of State on May 25, 2017, by Adams as its organizer and registered agent. TT's articles of organization identified it as a manager-managed company with Adams as the manager.

18.      Winning Investments LLC ("WI") was a purported investment club registered with the Oregon Secretary of State on May 26, 2017, by Adams as its organizer and registered agent.  WI's articles of organization identified it as a manager-managed company with Adams as the manager.

19.      Safe Investments LLC ("SI") was a purported investment club registered with the Oregon Secretary of State on October 6, 2017, by Adams as its organizer and registered agent.

SI's articles of organization identified it as a manager-managed company with Adams as the manager.

20.    Platform Jan 2018 LLC ("PJ18") was a purported investment club registered with the Oregon Secretary of State on January 8, 2018, by Adams as its organizer and registered agent.  PJ18's articles of organization identified it as a manager-managed company with Adams as the individual with direct knowledge and manager.

21.    Platform 218 LLC ("P218") was a purported investment club registered with the Oregon Secretary of State on May 7, 2018, by Adams as its organizer and registered agent.  P218's articles of organization identified it as a manager-managed company with Adams as the individual with direct knowledge.

22.    Each of these other relevant entities, hereinafter referred to collectively as "pools," listed as its mailing address Defendants' address in Bandon, Oregon.  None of the pools have ever been registered with the Commission in any capacity.

23.    Platform 13 LLC ("P13") was an additional, purported investment club registered with the Oregon Secretary of State on October 17, 2017, by Adams as its organizer and registered agent.  For the conduct that is relevant here, P13's sole role was to facilitate the conclusion of an IB agreement from which Defendants benefitted.  As was the case with the pools, P13 listed as its mailing address as Defendants' address in Bandon, Oregon, and has never been registered with the Commission in any capacity.

## IV.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

### A.    Leveraged Forex Transactions

24.    Section 2(c)(2)(C)(i)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I), in relevant part, applies to any agreement, contract, or transaction, in foreign currency that is offered to, or

entered into with, a person that is not an eligible contract participant ("ECP") "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," subject to certain exceptions not applicable here.

25.    The Act defines an ECP, in relevant part, as a commodity pool that has total assets exceeding $5,000,000 and for purposes of Section 2(c)(2)(C)(vii) of the Act excluding a commodity pool in which any participant is not otherwise an ECP, or an individual who: (i) has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or (ii) $5 million if the individual enters into the transaction to "manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." Section 1a(18)(A)(iv), (xi) of the Act, 7 U.S.C. § 1a(18)(A)(iv), (xi).

26.    Section 2(c)(2)(C)(i)(I) of the Act is applicable to some of the transactions at issue here because these transactions in certain foreign currencies were offered or entered into with the non-ECP pools, as defined above, on a leveraged or margined basis by an offeror or counterparty who was not subject to the exceptions specified in Section 2(c)(2)(C)(i)(II) of the Act.

27.    Further, as discussed below, the definitions of a CPO and a CTA encompass those entities or individuals that solicit, receive, or accept funds from others for the purpose of trading in transactions described in Section 2(c)(2)(C), or that for compensation or profit provide trading advice regarding the same.

**B.    Leveraged Metals Transactions**

28.    Section 2(c)(2)(D)(i) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), applies to "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to (even if not entered into with), a non-ECP—i.e., a person who is a retail customer—"on a

leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," subject to certain exceptions not applicable here.

29.     Section 2(c)(2)(D) is applicable to the gold and silver transactions at issue here because: (i) these transactions were offered or entered into with the non-ECP pools on a leveraged or margined basis by the offeror or counterparty and are not subject to the specific exceptions in Section 2(c)(2)(D)(i) of the Act; and (ii) because gold and silver are "commodities" as defined by Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

30.     Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii), transactions described in this section are subject to Section 4(a) of the Act, 7 U.S.C. § 6(a), "as if the agreement, contract, or transaction was a contract of sale of a commodity for future delivery."  Section 4(a) of the Act makes it unlawful for any person to offer to enter into, enter into, execute, confirm the execution of, or conduct an office or business in the United States for the purpose of soliciting, or accepting any order for, or otherwise dealing in any transaction in, or in connection with, a commodity futures contract, unless such transaction is made on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market for the specific commodity.

31.     Further, as discussed below, the definitions of a CPO and a CTA encompass those entities or individuals that solicit, receive, or accept funds from others for the purpose of trading in transactions described in Section 2(c)(2)(D), or that for compensation or profit, provide trading advice regarding the same.

**C.     Commodity Pools and Commodity Pool Operators**

32.     In relevant part Section 1a(10) of the Act, 7 U.S.C. § 1a(10), defines a commodity

pool as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any . . . (ii) agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title."

33.     Section la(11)(A) of the Act, 7 U.S.C. § la(11)(A), defines a commodity pool operator in relevant part as "any person—(i) engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any . . . agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title . . . ."

### D.    Commodity Trading Advisors

34.     In relevant part Section 1a(12) of the Act, 7 U.S.C. § 1a(12), defines a commodity trading advisor as "any person who—(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in . . . any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title . . . ."

### E.    Advertising by Commodity Pool Operators and Commodity Trading Advisors

35.     Regulation 4.41(b)(1), 17 C.F.R. § 4.41(b)(1), in relevant part states that, "No person may present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest of a commodity pool operator, commodity trading advisor, or any principal thereof," unless such

performance is accompanied by a statement regarding simulated or hypothetical results prescribed in Regulation 4.41(b)(1)(i).

36.     The statement prescribed in Regulation 4.41(b)(1)(i) states in part, "These results are based on simulated or hypothetical performance results that have certain inherent limitations . . . No representation is being made that any account will or is likely to achieve profits or losses similar to these being shown."

### F.     Introducing Brokers and Associated Persons of Introducing Brokers

37.     In relevant part Section 1a(31) of the Act, 7 U.S.C. § 1a(31), defines an IB as "any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant)—who—(I) is engaged in soliciting or in accepting orders for . . . any agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title . . . ."

38.     In relevant part Regulation 1.3, 17 C.F.R. § 1.3 (2023), defines an associated person of an IB as "a partner, officer, employee, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves . . . The solicitation or acceptance of customers' orders (other than in a clerical capacity) . . . ."

## V.     FACTS

### A.     Defendants' Operation of Commodity Pools

#### a.  Background Summary

39.     During the Relevant Period, Adams, together with SimTradePro, which he founded, controlled, and served as an agent for, established and operated at least six purported "investment clubs."  In reality, these clubs, or pools, operated as commodity pools as defined by the Act, each comprising approximately four to more than forty U.S. participants many of whom

were non-ECP or non-eligible commercial entity participants or customers ("customers" or

"participants"). Defendants operated the pools, investment trusts, syndicates, or similar forms of

enterprise for the purpose of trading in leveraged, margined or financed agreements, contracts or

transactions in forex such as the British Pound, Japanese Yen, and Euro that do not result in

actual delivery within two days, and leveraged, margined or financed agreements, contracts or

transactions in metals such as gold and silver that do not result in actual delivery within 28 days.

40.     Leveraged trading allowed the pools to control a larger amount of currency or

metals to be traded with a fractional amount of collateral or margin. For example, 100/1

leverage allowed the pools for every dollar of collateral deposited, $100 worth of the currency

pairs or metals traded. Leverage has the potential to magnify profits, or, as was the case here,

losses.

41.     At least a few of Defendants' customers were in Oregon.

42.     All of Defendants' customers and agents discussed below were in the United

States. Further, Defendants' webinars, website, in person events, and email solicitations

occurred in the United States.

43.     Adams, on behalf of Defendants, solicited at least approximately $2.3 million

from more than 100 U.S. retail or non-ECP customers to invest in the pools for purposes of

trading in leveraged forex and leveraged metals on behalf of the customers. Approximately $2

million of these funds were lost in trading.

44.     Many of Defendants' customers were planning for retirement and used a self-

directed individual retirement account ("SDIRA") custodian recommended by Defendants. Few,

if any, customers had experience in investing in leveraged forex or leveraged metals.

45.     Customers ranged from retirees seeking to boost their investment income to small

business owners to a younger participant seeking to pay off a student loan.

46.    Customers were charged a $3,000 non-refundable, origination or enrollment fee up front and signed a 10-year engagement agreement for lower-risk pools.  Defendants informed customers of three fees that were charged to them: (i) the aforementioned origination or enrollment fee; (ii) a "high water" fee charged on a quarterly basis as compensation for among other tasks, finding, recommending, implementing, and supporting the trading strategies Defendants recommended to participants, but, only if the pools were profitable and of which Defendants would receive five percent; and (iii) bank or brokerage fees that were not controlled by, or paid to, Defendants.

47.    Defendants' stated goal to customers was to build customers' retirement savings through 65 percent annual returns that were purportedly achievable by trading leveraged forex and leveraged metals.

48.    Adams had little, prior experience in leveraged forex or leveraged metals trading and principally relied on an associate ("Associate A") as his purported "forex guru" and expert.

**b.  Defendants' Activity as an Unregistered CPO**

49.    Adams and SimTradePro received and pooled customer funds into separate bank accounts for each of the pools that were opened and managed by Defendants at a U.S. bank. Defendants then transferred these funds to an Ireland-based trading platform ("Ireland Platform" or "Irish Broker"), where at Defendants' direction, approximately $2.3 million in customer funds were pooled into leveraged forex and leveraged metals trading accounts that Defendants opened and had traded in the name of the pools.

50.    Defendants identified individual pools in trading account applications as for example a "Collective investment scheme and/or Management Company of such schemes" and the pool's source of funds as for example, "Membership funding."

51.    In these applications, Defendants stated that the purpose of the pools was for example to "invest the assets of the Company [pool] for the education and benefit of the Members."

52.    Defendants established and managed bank accounts for the pools for the receipt of customer funds, and provided the pools with accounting, tax preparation, and state corporate registration services, along with operating the SimTradePro website and hosting periodic webinars for members to obtain information regarding the status of their trading accounts and to promote new trading strategies.

53.    Defendants solicited non-ECP U.S. customers in Oregon and throughout the United States for "ordinary funds [that] can be combined to create a large pool for investing." Defendants did this using at least six means of interstate commerce: (i) SimTradePro's website; (ii) on-line live and recorded webinars; (iii) spreadsheets posted on the SimTradePro website and displayed during webinars; (iv) emails; (v) their YouTube channel; and (vi) in-person events held around the United States and that were advertised and coordinated through means of interstate commerce.

54.    Adams on behalf of Defendants told customers: (i) "the advantage of a pool is that we get exponential growth [because] more money means more money, it's just that simple" and that "[a pool] works this just simply works;" and (ii) that clubs were the "only way, the only way" customers could access the same type of investments as more sophisticated and capitalized customers could.

55.     Defendants had at least four agents who assisted in soliciting customers to invest in the pools and in the pools' operation: (i) a forex trading "expert" (the aforementioned Associate A); (ii) a "chief development officer" ("Associate B"); (iii) an enrollment and registration manager or coordinator to assist in completing requisite paperwork and coordinating the transfer of funds from SDIRAs among other responsibilities; and (iv) a membership manager or coordinator.

56.     Defendants' solicitations focused on at least five themes for attracting customers to invest in the pools: the ability to realize higher gains, graduated risk levels to accommodate customer needs, retirement security, conservative/lower risk investing, and favorable tax treatment.  According to Defendants' solicitations, these would be accomplished by among other means: (i) pooling funds and profiting from purported "exponential growth;" and (ii) by escaping U.S. regulation, in particular Dodd-Frank Act-related and other requirements limiting maximum allowable trading leverage to 50/1 pursuant to Regulation 5.9, 17 C.F.R. § 5.9 (2023), and bans on leveraged gold and silver trading by U.S. retail customers on non-U.S. regulated exchanges. Defendants complemented the foregoing solicitation themes and means with claims of transparency to customers.

57.     Adams initially solicited customers to invest in the pools under three risk tiers and sources of income: (i) Tier I lower risk using "ordinary income;" (ii) Tier II lower risk using retirement income from SDIRAs; and (iii) Tier III using the same trading strategies as Tiers I and II but at a higher risk setting, and using "disposable income."

58.     In or about July 2018, concurrent with Defendants' introduction of a new trading strategy, Defendants solicited customers with "lite," "standard," and "aggressive" trading accounts set to how much leverage and risk customers wanted exposure to.

59.    Defendants' solicitations included live and recorded webinars with Associate A and at times Associate B, which were purportedly "mandatory" for customers, along with in-person events with Associate B.  Defendants' goal as stated by Associate B, was to "get people to retirement" with Defendants' typical pitch being that, as depicted below, presented during a June 14, 2018 webinar for existing and prospective participants: "Welcome to SimTradePro's Investment Clubs/Partnerships.  Ten Years to Retirement.  Is it really possible to accomplish a $MILLION$ dollar retirement in just ten years?  *ABSOLUTELY!*  Can it be done TAX FREE? ABSOLUTELY!!!!"



60.    During this webinar this pitch was preceded by Associate B telling prospective customers, "listen to the numbers that Bob [Adams] is throwing up you guys.  Because, put simply you'll never ever see anything like this around . . . Not only do we have a top strategist [Associate A] that just kills it . . . he knows I mean he knows how to eliminate the risk because the way that he strikes . . . you need to get in, you need to get in."

61.    Similarly, Associate B, on behalf of Defendants, echoed Defendants' solicitation to remain invested in the pools despite losses, telling participants during a March 2018 webinar, "These dips mean nothing to me, at the end of the year you're gonna be at 60-70 percent or whatever they have been doing every other year, it's not going to change I promise ya."

62.    As the pools' losses deepened, Defendants' solicitation increasingly focused on soliciting customers to remain invested in the pools with promises of funds recovery and future profits. For example, during an August 1, 2018 webinar, Adams presented a spreadsheet to customers showing how the purported funds recovery would work while telling customers "all of you are looking at this thinking that it's going to be impossible to recover [trading losses]. It's not, and it's not going to be that long. I keep telling you that. But I want you to understand it's not going to be really that long." Further, that "we're expecting a much higher return rate" than the monthly average 18.69 percent shown on a spreadsheet.

63.    As part of their solicitation of customers to invest in the pools, Adams also emphasized that by using the Irish Broker that was (according to them) unregulated in the U.S., the pools could escape the "dead hand" and "stranglehold" of U.S. regulation under the Dodd-Frank Act, which Defendants knew outlawed unregulated trades in leveraged metals and the use of higher leverages.

64.    Defendants' opting for the Irish Broker was calculated regulatory arbitrage. After being rebuffed by a Commission-regulated broker due to their lack of registration as a CPO Adams emailed customers stating that, "Setting up the accounts at a U.S. bank [broker] has become a nightmare. Way too many rules and the time to get it setup will be delayed."

65.    It was Defendants' use of one hundred to one (100/1) trading leverage in foreign currencies such as the Japanese Yen and British Pound, and failed leveraged gold trading, both conducted on the Ireland Platform, that contributed significantly to Defendants' losses of customers' funds.

66.    During the Relevant Period, Defendants were not registered with the Commission as a CPO.

**B.    Defendants' Activity as an Unregistered CTA**

67.    In addition to operating the pools, Defendants for compensation or profit, engaged in the business of advising customers through electronic media in interstate commerce, such as Defendants' website, webinars, YouTube channel, emails and phone calls, as to the value of or the advisability of trading in leveraged forex and leveraged metals.  Defendants' compensation, as advertised, consisted of the aforementioned: (i) $3,000 up front fee charged to participants; and (ii) five percent "high water" fee pegged to the pools' profits—if any.

68.    Defendants' advice to customers during the Relevant Period was that they should invest in, and despite losses remain invested in, three trading strategies Adams recommended to execute leveraged forex and metals trades on customers' behalf.  These strategies were dubbed "Steady Capture," "Test Test" later "Flash Forward," and "Argo."  Based on Defendants' advice, participants voted to invest in these strategies.  None were ultimately profitable.

69.    Through a webinar from Oregon, Defendants pitched to customers the first of these strategies, Steady Capture, as the "crown jewel of the forex world" and the "number 2 forex strategy in the world [based on its returns]," that "never loses money" in the hands of a specific trader.  According to Defendants' solicitations, by investing in Steady Capture to trade leveraged forex and leveraged metals, customers could anticipate profits of 65 percent a year and more than five percent a month based on the strategy's 355 percent profit during the previous approximately three-and-a-half years.

70.    Further, Defendants told customers that by investing in Steady Capture, their "risk of ruin"—i.e. the chance that they would have significant losses—was nearly zero.

71.    When Steady Capture sustained significant losses in February 2018, Defendants pitched to VI2, WI, TT, and then SI customers a new trading strategy, "Test Test" during

"mandatory meeting" webinars Defendants hosted from Oregon on February 15 and 20, 2018.

Defendants told customers that Test Test purportedly had been used for years after being

developed by Associate A, and, that based on a 30-day demonstration, produced a "tremendous"

and "phenomenal" return rate of approximately 16 percent.

72.    Adams presented Test Test to these customers as an "opportunity to accomplish

something more" that is "not going to cost us anything, so there is no reason not to do it in my

opinion."

73.    Adams further recommended Test Test to customers as a "Time to diversify," and

that, switching 25 percent of customers' investment funds to Test Test was, as he presented

below, a "no brainer" because according to Adams' narration, "it's the fastest way that we can

make up for those unexpected losses that happened in Steady Capture."

REMEMBER . . . . .

- YOU MUST VOTE BY THE 21ˢᵗ.
- The percentage of participation weighs into the percentage of agreement for the vote. (The more money invested has a greater value in the vote.)
- This requires a 2/3 majority to pass.
- (From our perspective, this is a no brainer. It could quickly make up for the losses experienced in Steady Capture.)

74.    Similarly, Associate A, on behalf of Defendants, told customers during the

February 15, 2018 webinar that Test Test was a "pretty darn good thing just to diversify in my

humble opinion."  Further, like Steady Capture, the "risk of ruin" with Test Test purportedly was

marginal.

75.     Following Defendants' recommendation, the VI2, WI, TT, and SI pools, through a majority vote of participants, authorized applying 25 percent of their funds to the Test Test trading strategy.

76.     Subsequently, during a March 21, 2018 quarterly webinar for the TT pool, Defendants upped the ante in recommending that customers now devote a higher percentage of their invested funds to "Flash Forward," formerly, Test Test.  Adams on behalf of Defendants reemphasized to customers that Flash Forward had a "long long history" and was a strategy that "has been quite successful for quite a while."

77.     During this webinar, Adams further told customers, "I am pretty much convinced that a change in the percentage that we have there could very quickly make up for the losses [in Steady Capture]."

78.     Again, following Defendants' recommendation, the TT pool voted to apply the Flash Forward trading strategy to 90 percent of their invested funds or more than three times the previous 25 percent.

79.     Beginning in July 2018 when Defendants' recommended Flash Forward strategy too failed, Defendants shifted their advice to customers to a third trading strategy dubbed "Argo."  Argo was purportedly an algorithmic strategy devised by Defendants using trading robots or "bots," also referred to as "expert advisors," that according to Defendants "would take the emotion out of trading."

80.     Specifically, Adams on behalf of Defendants told customers in a July 12, 2018 email, that Argo had "eight years of consistent growth, minimal exposure (drawdown), and an average of 29 percent gain each year."  Adams buttressed this claim in a July 18, 2018 email to customers with "I am not going to predict what the results will be, but I am confident you will be

pleased, not just by the gains, but the protection as well."

81.    Like its failed predecessor, Flash Forward, Adams pitched Argo as the means of recovering funds lost in trading.  For example, Adams told customers during the August 1, 2018 webinar that through using Argo, the recovery is "not gonna be that long."  Despite his earlier disclaimer of not predicting results, Adams further stated that "I know we can" achieve profitability of 55 to 65 percent per year, while showing customers a spreadsheet of how the recovery was purportedly "gonna work."

82.    Attempting to recover earlier trading losses, Defendants advised customers to adopt refinements to the Argo trading strategy.  Defendants did this by among other steps advising customers to authorize Defendants to add, remove, and retain various "bots" that controlled the trading of customers' funds.  For example, Associate A, on behalf of Defendants, told customers during a September 27, 2018 general partnership webinar for all participants, "in my humble yet somewhat expert opinion, I would really like everyone to stick with [bots] one, two, and three because they have been doing great."  These bots along with stop-losses to exit losing trades should, according to Defendants' advice, provide profitable results.

83.    Defendants were wrong.  Argo was no more successful than the predecessor strategies recommended by Defendants.  In January 2019, Defendants closed the accounts at the Irish Broker and returned approximately 13 percent of customer funds invested.  Because of the pools' unprofitability, Defendants received relatively little compensation from high water fees, and thus, increasingly relied on undisclosed IB fees for their compensation, as described below.

84.    During the Relevant Period, Defendants were not registered with the Commission as a CTA.

C.    **Defendants' Material Omissions and Misrepresentations to Customers While Acting as a CPO and CTA—Undisclosed IB Fees**

85.    An integral and material part of Defendants' solicitation of customers, both in their initial solicitations and customer disclosure and agreement documents, and while selling customers on new trading strategies, was that the only compensation that Defendants received were the aforementioned: (i) one-time origination or enrollment fee; and (ii) high water fees tied to the profitability of the pools' trading accounts.

86.    Regarding the latter, as shown below, Adams repeatedly, and knowingly or recklessly, told customers that Defendants would not get paid until the pools made money. This wasn't true.

87.    In fact, during the Relevant Period, Defendants split at least $185,000 in IB fees—drawn from customer funds—with Associate A, who through a company he controlled acted as an IB for the Irish Broker. Because these fees significantly comprised Defendants' income stream due to their unprofitable trading and general failure to qualify for high-water fees, Defendants' cut of IB fees, as noted, became increasingly important to them.

88.    Defendants' IB fees were withdrawn by the Irish Broker from customers' funds through a charge made to each of the more than 35,000 round-trip trades made on customers' behalf, and then, periodically wired to a U.S. bank account controlled by Associate A. On the same or following day these funds were wired by the Irish Broker, the funds were divided by Associate A and wired to a bank account in the United States controlled by Adams.

89.    The chronology of Defendants' material omissions and misrepresentations to customers regarding IB fees is telling.

90.    On January 11, 2018, at the kick-off webinar for a new pool, SI, and at a separate webinar for another pool, TT, both hosted from Oregon, Adams claimed on behalf of

SimTradePro that there were no fees payable to Defendants other than the one-time origination fee and the high water fee if the pools were profitable stating, "Become a member of SimTradePro Pay a ONE TIME ONLY fee of $3,000 . . . What's a HIGH WATER MANAGEMENT fee?  To support the work of the broker, trader, and SimTradePro, there is a fee charged ON THE NET GAINS ONLY of each quarter" while adding "Are there any other fees?  NOPE.  None.  If the quarter is not profitable, the HIGH WATER MANANGEMENT FEES are not charged either . . . so there's no other out-of-pocket expenses for you guys." Defendants' statements were consistent with customer agreement and disclosure documents made available by them to the SI and TT pool participants as well as the VI2, WI and subsequent pool participants.

91.     In February 2018—contrary to the above representations, and unknown to customers—Defendants, and Associate A as Defendants' agent, devised a means of receiving IB fees withdrawn from customer trading accounts opened going forward.

92.     Specifically, on February 6, 2018, Associate A told the Irish Broker, "I just got off the phone with Bob [Adams].  He and I have decided to have a new IB account created with you at [Ireland Platform] under a LLC."  As creation of the IB account moved forward Adams was ecstatic, telling Associate A, "Good for you . . . We are going to need this [IB fees] MUCH sooner than we thought earlier."  Adams' statement underscored the importance of the IB fees as a source of income to Defendants in lieu of high water fees that would not be forthcoming to them due to the pools' trading losses using the Steady Capture strategy.

93.     This arrangement with the Ireland Platform was established using P13's corporate information to create an omnibus trading account under which subaccounts were created for each of the then active pools, WI, VI2, TT and SI.  Concurrent with this IB fees arrangement,

Defendants, as discussed below, advised WI, VI2, TT and SI participants to adopt the Test Test,

subsequently Flash Forward, trading strategy that would supplement, and eventually, largely

replace Steady Capture using the aforementioned trading sub-accounts from which IB fees would

be collected.

94.     During "required attendance" meetings on February 15, 2018 for WI, VI2, and TT

participants, and on February 20, 2018 for SI participants, Defendants urged them to adopt the

Test Test, later Flash Forward trading strategy to supplement the losing Steady Capture strategy

for among other reasons that there was no cost and "no fees."  For example, during the February

15, 2018 webinar, Adams told WI, VI2, and TT participants, "you don't have to come up with

any extra money, there's no money involved in having to move from you at any way shape or

form."

95.     Further, during the same webinar Adams stated that moving to Test Test "doesn't

cost you anything, there's no fees" while never disclosing to customers the IB fees.  In fact, on or

about February 19—unknown to customers, and with Defendants' knowledge—Associate A

signed an IB agreement with the Irish Broker to collect fees from WI, VI2, TT, and SI

participants' funds.

96.     On March 4, 2018, a WI participant ("WI Participant A") emailed Adams with

questions about the "Test Test" strategy including, "Would there be fees if we aren't making

money?"  In a same day email response to WI Participant A Adams stated, "There are NEVER

any fees if it [Test Test] doesn't make money, (the exception being the bank fees which we have

no control over).  This is why I like the High Water Fees system.  I don't make any either so it's

just as important to me as it is to our members."

97.     Four days after this email exchange, on or about March 8, 2018, under the IB fees

arrangement, the Ireland Platform began withdrawing IB fees from customer funds involved in trades—whether these individual trades or the pools were profitable or not. These fees, that were withdrawn from customer funds, were then deposited in an Associate A-controlled account at the Ireland Platform. As noted, the Irish Platform withdrew IB fees from more than 35,000 round-trip trades placed on behalf of customers, and periodically wired these fees to Associate A who split them with Defendants.

98.    Thus, Defendants despite: (i) telling SI and TT participants in the January 11, 2018 webinars that there were no fees payable to Defendants other than the origination fee and high water fee as alleged in paragraph 90; (ii) urging VI2, WI, TT, and SI participants to adopt the Test Test strategy for among other reasons because "there's no fees," as alleged in paragraphs 94 and 95; and (iii) telling WI Participant A that there were no fees unless "Test Test" made money as alleged in paragraph 96, Defendants failed to disclose to customers either the February 18, 2018 IB agreement or the withdrawal of IB fees beginning on March 8, 2018.

99.    These failures by Defendants comprised material omissions because they involved material facts related to customers' investments, and, rendered Defendants' January 2018 statements regarding fees payable to them, February 2018 statements regarding cost to customers, and Defendants' March 4, 2018 email to WI Participant A, misleading.

100.    On March 21, 2018, during the quarterly webinar for TT participants, Defendants suggested that participants reallocate a larger share of their investment funds to the "Test Test," now "Flash Forward" strategy—an allocation under which Defendants' share of IB fees would increase. As part their recommendation, Adams underscored Defendants' no profits, no fees claim stating, "the good news about the high water fees guys is that if there is no profit, there is no fees. It's that simple. That includes the five percent that comes to me [Adams] to maintain

this whole organization that we're doing.  Alright, you have to be profitable in order for us to be

profitable, in order for us to keep this thing going.  So, it's absolutely critical that we make sure

that we are successful with our investments."  Defendants made this claim even though they

were aware the IB agreement was already in place under which they would receive fees whether

the pools were profitable or not.

101.    On April 26, 2018, during a general partnership webinar for the VI2, WI, TT, SI

and PJ18 participants while explaining how they would recover recent forex trading losses using

the "Flash Forward" strategy, Adams and Associate A assured customers that:

> Adams: Is the effort to recover the [trading] losses going to cost me [customer]
> anything?  I have heard that one [question] also from several people in the last
> couple days . . . ."
>
> Associate A: "No, no . . . it's not at all . . . it's not going to cost anything.  So there
> is a high water mark performance fee on these accounts on new profits and until
> there's new profits there is no fee at all, there is no fee at all.  So there will be no
> fees withdrawn, no charges taken out, nothing until the funds are at least to new
> account highs . . .  So they [customers] don't need to worry about anyone having to
> pay anything.  I mean that's the worst thing, the worst thing to have in the world to
> be to say hey just lost a ton of money now pay us this fee.  So that's not, that's not
> the way it works."
>
> Adams: That's one of the reasons I was attracted to what we're doing anyway.  I
> like it, I love it . . . I've been self-employed for thirty, forty years.  And I like being
> rewarded for the work that I do,  And, if I'm not doing the job than I don't deserve
> to get paid.  So it's the same thing here . . . So if those things [high water fees]
> aren't successful right now I'm paying for everything out of my own pocket . . .
> I'm okay with that, I'm okay with that.  I'm a believer in what we're accomplishing
> here.  And I'm committed to making it go all the way too.  So I just wanted for you
> guys to be aware that's what's happening with me as well.

102.    As depicted below, that same day, April 26, 2018, the Ireland Platform wired

$24,275.60 to a U.S. bank account controlled by Associate A, who then wired approximately

half, $12,137.50, to a U.S. bank account controlled by Adams—the first of eight IB fees

payments, withdrawn from customers' funds, that Defendants received.



103.    Further, as depicted below, these funds came from the Associate A account expressly set-up at the Irish Broker to collect the IB fees withdrawn from trades placed on customers' behalf, here showing as examples, fees withdrawn and Defendants ultimately compensated from, four losing trades (#7020624-27) placed on behalf of the TT, VI2, WI, and SI pools.

| Ticket | Open Time | Type | Volume | Item | Price | S / L | T / P | Close Time | Price | Commission | Taxes | Swap | Profit |
|--------|-----------|------|--------|------|-------|-------|-------|-----------|-------|-----------|-------|------|--------|
| 7029971 | 2018.04.24 11:06:06 | balance | Margin withdrawal | | | | | | | | | | -24 325.00 |
| 7028266 | 2018.04.24 07:05:57 | balance | agent | - #7020627 | | | | | | | | | 3.76 |
| 7028265 | 2018.04.24 07:05:57 | balance | agent | - #7020625 | | | | | | | | | 3.35 |
| 7028264 | 2018.04.24 07:05:57 | balance | agent | - #7020626 | | | | | | | | | 5.78 |
| 7028263 | 2018.04.24 07:05:57 | balance | agent | - #7020624 | | | | | | | | | 2.39 |

104.    Thus, April 26, 2018, the same day Defendants knowingly or recklessly told VI2, WI, TT, SI, and PJ18 participants that they were not being paid until the pools made money, Defendants were in fact, being paid.

105.    Defendants' statements as alleged in paragraphs 100 and 101 constituted misrepresentations or omissions because: (i) Defendants knew that Associate A had entered into the IB agreement through which Defendants knew they would be paid through fees deducted from customers' trading funds, whether those trades were profitable or not, yet, Defendants told customers the opposite; or (ii) Defendants' statements misled participants by omitting that they

were being paid fees whether the pools were profitable or not.

106.    Further, Defendants knowingly or were reckless in making these representations while assuring WI, VI2, TT, and SI participants as well as prospective participants during the April 26, 2018 webinar that the pools' forex trading losses were recoverable.  For example, Adams told participants, "These kind of influxes [trading losses] as odd as this one has been is still recoverable it's just not the end of the world by any means . . . I have every confidence that once we get out of this particular basket [of trades] that we're in, it [trading strategy] it'll go back to making those 15 percent ranges again, it's just that good a strategy."  Additionally, Associate B who participated in the webinar on Defendants' behalf told participants that the pools' trading losses were "totally recoverable, long term nothing's changed, everthings fine, everythings happy and you guys will be very, very happy, we will hit those [profit] goals."

107.    Among those participants who viewed the April 26, 2018 webinar were WI Participant A, VI2 and TT Participant B, and SI and TT Participant C.  These participants in part relied on Defendants' statements that they would not be compensated until the pools were profitable along with Defendants' confident predictions that trading losses would be recovered to remain invested with SimTradePro.

108.    Less than three months later, during successive July 12, 2018 webinars for the VI2, WI, TT, SI and then PJ18 participants hosted from Oregon, and in subsequent emails, Defendants double-downed on their no additional fee claim.  Concurrent with their attempts to sell customers on a third trading strategy, Argo, in the face of mounting trading losses using Flash Forward, Adams stated during the July 12, 2018 webinar for VI2, WI, TT, and SI participants, "between now and that time [when the pools' funds were recovered] you're still paying nothing.  There is no cost to you do to do this.  Our goal is simply to get to where we

said, where we're going to go, and that's to get to sixty-five percent [profit] per year."

109.    Adams repeated this no fees claim during the subsequent July 12, 2018 webinar for PJ18 participants, telling them, "until all of that money is recovered there is no high water fees, none."

110.    In a same day (July 12, 2018) email Adams told customers, "I would encourage you to just keep them [customer funds] in the game.  There are no additional fees to you and no High Water Fees until ALL of the initial investment funds are COMPLETELY recovered."

111.    On July 17, 2018, five days after the webinars and follow-up email, Defendants received a $9,884 wire transfer from Associate A as part of their cut of IB fees—the third such deposit they had received since April.

112.    On July 18, 2018, the day after this payment was received, Adams, on behalf of Defendants, followed with an email to all customers about how the "recovery" of their trading losses would work.  In relevant part it stated,

Q.  How can we recover from this?

. . . So, to answer your question, YES, I DO BELIEVE WE CAN RECOVER THE FUNDS.  I have a stake in this, too.  The 5% high water fees needed to support the groups for the upcoming year is coming out of my personal pocket.  We ALL deserve to win, and that is what I am committed to accomplishing. (HINT, did I mention I NEVER GIVE UP?).

113.    VI2, WI, TT, and SI participants who listened to the July 12, 2018 webinar and received Defendants' July 12, 2018 and July 18, 2018 emails based their decisions to remain invested with Defendants in part on Defendants' assurances that they were paying nothing until the pools' funds were recovered, along with Defendants' assurances that their funds were recoverable through the Argo trading strategy.  Among these participants were WI Participant A, VI2 and TT Participant B, and SI and TT Participant C.

114.    Defendants' statements as alleged in paragraphs 108 to 112 above constituted misrepresentations and omissions because: (i) Defendants knew that through the IB agreement they were being paid through fees deducted from customers' trading funds—whether the pools were profitable or not; and (ii) by failing to disclose to participants the IB payments they were receiving from participants' funds, Defendants' statements misled participants into believing that Defendants would receive no fees until the pools were profitable.

115.    Defendants' subsequent, misleading representations to participants included, for example, membership and disclosure application forms provided by Defendants to pool P218 participants that informed them of only two fees that were payable to Defendants: "(i) HIGH WATER MANAGEMENT FEES . . . These are assessed each quarter If there is not profit, there are no fees;" and (ii) "ENROLLMENT FEE: There is a onetime enrollment fee of $3,000 per member to access and participate in our platforms."  None of these documents disclosed to P218 participants that there was indeed a third fee that was collected by Defendants, the IB fee.  Nor did Defendants correct these misstatements.

116.    Instead, like the other pools, without telling P218 customers, Defendants began collecting IB fees drawn from their funds, whether the pool was profitable or not, when the pools' accounts started trading on or about August 7, 2018.

117.    Meanwhile, Adams celebrated periodically with Associate A the receipt of IB fees, withdrawn from customer funds, in email exchanges: (i) June 7, 2018 Associate A email to Adams: "IB at 6800 total now . . . working it for us! :).  Adams: "You are AMAZING . . . .;" (ii) August 23, 2018 Adams email to Associate A: "Over $630 IB fee today;" and (iii) September 14, 2018 Associate A email to Adams: "Today's trades should be just what I wanted and also get us a nice IB fee to boot.  Woot."  Adams's response: "That's great news!  You truly are DA MAN!"

118.    Even as Defendants wound down operation of the pools in December 2018 and January 2019 after losing approximately 87 percent of customer funds, three additional IB payments, totaling $43,995, were received by them.

119.    Subsequently, in an April 29, 2019 email announcing the final closure of SimTradePro and the pools, without disclosing their withdrawal of IB fees from customer funds, Adams on behalf of Defendants told customers that SimTradePro had covered all the overhead expenses for the pools.

120.    Defendants' omissions and misrepresentations regarding IB fees were material because: (i) they related to the reduction of customer funds without customers' authorization or knowledge; and (ii) Defendants' no fees claims were a core feature of their solicitation of customers and impacted customers' decisions to invest, and remain invested with Defendants.

### D.    Defendants' Omissions and Material Misrepresentations to Customers While Acting as a CPO and CTA—Leveraged Gold Trading

121.    Defendants' fraud also consisted of omissions and material misrepresentations regarding certain leveraged gold trades supervised by Defendants in or about July 2018 in an attempt to rescue the losing Flash Forward trading strategy by redistributing its portfolio almost entirely into leveraged gold due to disruptions in the forex markets.  Rather than disclose the true nature of these gold trades that contributed significantly to the loss of approximately $2 million or approximately 87 percent of customers' funds invested with the pools from which they never recovered, and, to convince customers to adopt yet a third trading strategy dubbed "Argo," Defendants made two related misrepresentations or omissions.  Defendants' knowing or reckless misrepresentations or omissions regarding the reasons for those losses and their own role in locking-in the losses without consulting customers were material to customers' decisions to remain invested with Defendants.

122.    First, as detailed below, Defendants misleadingly told customers that all the unprofitable trades in gold had been made as of July 1, 2018, before "stop losses"—here, an order to sell the gold as it fell past a specified price—were in place that would have prevented precipitous losses.

123.    For example, during Defendants' successive July 12, 2018 webinars for the VI2, WI, TT, SI, and PJ18 participants noted above, in explaining the pools' gold trading losses, Adams misleadingly told customers "so Flash Forward as I mentioned earlier we have set up a new twenty percent barrier that we have put into place as of July 1st, however, prior to that time the brokerage service [trader] had already invested heavily in gold based on traditional indicators with devastating results."

124.    Similarly, Associate A, after being introduced by Adams as "the expert in this particular area [gold trading]" told PJ18 participants during the July 12, 2018 webinar, "this basket of trades in gold has been going on for two and half weeks now almost three weeks so even though we have that twenty percent border that we put in, that stop loss, that fail safe, it only applies to new trades, and we haven't had anything new since the start of this month [July] we're still in the same thing."

125.    The same day (July 12, 2018) in a meeting summary email to customers, Adams, on behalf of Defendants, misleadingly told customers that Flash Forward "[which] had new stoppage parameters installed on July 1, was caught in a spiral of Gold that was purchased just prior to [July] the 1st."

126.    Six days later, in a July 18, 2018 email to customers, Adams, on behalf of Defendants, misleadingly stated, "Q.  Why wasn't the 20% stop loss put in play?  A.  The new

20% stop loss was included in the algorithms AFTER July 1st. The GOLD had all been purchased in the last weeks of June. As the market fell the 20% wasn't in effect yet."

127.    In fact, contrary to Defendants' representations in paragraphs 123 to 126 more than 650 buy and sell trades in gold were placed on behalf of the pools after July 1st. Overall, these trades: (i) were unprofitable—even with stop losses purportedly in place; and (ii) accounted for more than half of the losing trades and nearly a third of the pools' losses in July 2018 gold trading as the pools continued hemorrhaging money.

128.    Defendants' knowing or reckless statements regarding gold trading constituted material misrepresentations or omissions because: (i) Defendants misrepresented to participants—many of them with little knowledge of gold trading—when losing gold trades were made on their behalf and how their losses were sustained; or (ii) Defendants omitted material information from their statements alleged in paragraphs 123 to 126 regarding gold trading that rendered these statements misleading.

129.    Further, these misrepresentations and omissions were accompanied by Defendants' optimistic pitches to customers, beginning on July 12, 2018, urging them to adopt the "Argo" trading strategy with claims of purportedly "8 years of consistent growth, minimal exposure (drawdown), and an average of 29% gain each year."

130.    Second, as shown below, Defendants misleadingly told participants that the relevant pools' gold positions had all been closed by the Irish Broker while omitting disclosure of their own role in closing the trades. For example, when asked by WI Participant A in a July 14, 2018 email, "Why were we not given the option to sit tight and wait for gold prices to rebound? Adams, on SimTradePro's behalf responded the same day, "The brokerage services

are under mandates for all trading to close accounts/trades when the leverage falls below 30%. We were waiting, but when it hits a certain level it's not up to us."

131.    Four days later, in the July 18, 2018 email Adams, on behalf of Defendants, misleadingly told customers, "Q.  How was the decision made to sell at the lower [gold] prices instead of just hanging on longer?  A. . . . "it's not determined by the trader, but by the brokers."

132.    Defendants' statements regarding close-out of the gold trades: (i) constituted misrepresentations because in fact the Irish Broker had closed less than a quarter of the 650 plus gold trades made after July 1st while the remainder had been closed through Defendants; and (ii) an omission because Defendants materially misled customers by omitting that Defendants themselves had closed a significant number of the leveraged gold trades as part of their effort to abruptly exit the Flash Forward strategy and convince customers during the July 12, 2018 webinars to adopt the Argo strategy.

133.    For example, in an email exchange on July 10, 2018—two days before the July 12th customer webinars described above—Adams told Associate A, "OK. We have been suffering long enough on this stupid gold account.  If we get close to 1266, let's dump it and move on.  We need a finish by Thursday [July 12, 2018] so THEY [customers] can move on." Associate A responded, "Yes sir, that is the goal . . . Yes, we need to get out [of gold]."  Adams followed, "We have until Thursday evening [when the webinars to pitch Argo occurred], so WHEN we get near that 1266+, let er rip."  On the morning of July 13, 2018, Adams again emailed Associate A to confirm that all gold and other trades made through Flash Forward were closed.

134.    Acting as a CPO and CTA, Defendants failed to disclose material facts to their customers regarding their investments by failing to disclose Defendants' role in closing gold

trades.  Indeed, Defendants represented in the disclosure letter they provided to participants before and during the Relevant Period that the contract between the customer and SimTradePro "does not authorize SimTradePro, Inc. to control the investments of the investment club, or to make any investment decisions for the club, which such authority remains vested in the investors/owners."  Contrary to this provision instead of disclosing their activities to customers, and on their own, Defendants acted to help lock-in customers' losses due to leveraged gold trading.

135.    In sum, Defendants customers misled customers regarding the leveraged gold trading and neither provided customers with accurate and complete information nor an opportunity to make an informed decision regarding whether to exit the gold positions at a loss and adopt an entirely new trading strategy.

136.    Like the undisclosed IB fees described above, Defendants' knowing or reckless misrepresentations and omissions regarding leveraged gold trades were material because they obscured from customers what happened in an investment that comprised nearly their entire SimTradePro trading portfolio at the time it was closed, and, were made in the context of convincing participants to remain invested with Defendants even while the pools were losing money.

### E.    Defendants' Failure to Make Requisite Disclosures Regarding Simulated or Hypothetical Trading Results

137.    In soliciting customers during the Relevant Period to invest in the pools, and advising them to adopt the aforementioned trading strategies, Defendants repeatedly presented simulated trading results for these strategies.  Defendants did this during webinars, through their website, and through spreadsheets shown during webinars and posted on Defendants' website.

138.    The simulated results posted by Defendants showed purported profits ranging from the previous month to several years, and were labeled as simulated.  None, however, were accompanied by the requisite, written disclosure referenced in Section IV cautioning customers about the inherent limitations of simulated or hypothetical results and that no representation was being made that any account would, or was likely to achieve the results shown.

139.    For example, in recommending that VI2, WI, TT, and SI participants direct their investment funds to the "Test Test" later Flash Forward strategy during webinars on February 15 and 20, 2018, Defendants, along with Associate A acting on Defendants' behalf, presented hypothetical results showing the previous month's gain of more than 15 percent for a simulated $1 million account.

140.    Similarly, in an attempt to convince customers to adopt the Argo trading strategy, Defendants along with Associate A acting on Defendants' behalf relied on simulated results during successive webinars beginning on July 12, 2018, and continuing on July 24, 2018, August 1, 2018, and later.

141.    These and similar statements by Defendants, and by Associate A acting on Defendants' behalf, were buttressed by Defendants' spreadsheets posted on their website and during webinars during the Relevant Period, which presented simulated results for the trading strategies.  For example, these results posted by Defendants during the August 1, 2018 webinar and on Defendants' website showed that the Argo "lite" strategy at a profit of approximately 2.5 percent and five percent for Argo "standard" with the latter purportedly leading to an annual gain of 60 percent per year.  None were accompanied by the required written disclosure.

142.    In none of these examples, or any other instance of their repeated presentment of simulated results during the Relevant Period, did Defendants make the required, written

disclosure prescribed in Regulation 4.41(b)(1)(i), 17 C.F.R. § 4.41(b)(1)(i) (2023), detailing the limitations and associated risk of relying on simulated results.

143.    Few, if any, of the simulated results provided to customers by Defendants were actually achieved.

### F.    Adams' Activities as an Unregistered AP of an IB

144.    Pursuant to the IB agreement entered into between Associate A and the Ireland Platform, "The IB is responsible for acquiring new clients for the Company . . . The IB's task shall be to promote the Company's [Ireland Platform's] Services, to inform prospective clients about the Services and to keep in contact with and advise existing clients on all matters regarding the assets deposited with the company."  Further, the agreement, "hereby entrusts the IB with information regarding and with the right to promote the services offered by the Company . . . to prospective clients primarily in, but not restricted to North America."

145.    During the Relevant Period, Adams assisted Associate A in promoting the Ireland Platform's services to the pools including providing trading in leveraged forex and leveraged metals.  Adams did this through webinars and in SimTradePro customer applications to join a pool.

146.    For example during the June 14, 2018 webinar, Adams promoted the Ireland Platform: (i) as being able to offer leverages of two, or three hundred times—four and six times the U.S. limit—to "really make that thing [pools] grow and make a lot of money;" (ii) that "isn't stuck by the manipulations of the United States [regulations];" and (iii) as being "the perfect place to work" and "we like working with these guys, when we ask for something it's instantaneous."

147.    Similarly, applications provided by Adams-controlled SimTradePro to

prospective customers invited them to join a pool through which the Ireland Platform and its

associated bank that could provide "greater return and investment options than what are available

in the USA."

148.    Adams was aware of and supported the IB agreement from its inception in

February 2018.  Under it, for his solicitation services, Adams and Adams-controlled

SimTradePro received eight IB fee payments consisting of their split with Associate A.

149.    During the Relevant Period, Adams was not registered with the Commission as an

AP of an IB.

## VI.    STATUTORY AND REGULATORY VIOLATIONS

### COUNT I

### Violations of 7 U.S.C. § 6*o*(1)(A) and (B)
### CPO Fraud (Both Defendants)

150.    Paragraphs 39 through 66 and 85 through 136 are re-alleged and incorporated

herein by reference.

151.    Section 1a(10) of the Act, 7 U.S.C. § 1a(10), in part, defines a commodity pool as

"any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading

in commodity interests . . . . "

152.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a CPO, in

relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust,
> syndicate, or similar form of enterprise, and who, in connection therewith, solicits,
> accepts, or receives from others, funds, securities, or property, either directly or
> through capital contributions, the sale of stock or other forms of securities, or
> otherwise, for the purpose of trading in commodity interests, including any—. , .
> (II) agreement, contract, or transaction described in section 2(c)(2)(C)(i) [of this
> title] or section 2(c)(2)(D)(i) [of this title];

153.    During the Relevant Period, SimTradePro through Adams and its other agents engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests in the form of leveraged forex and leveraged metals transactions as described in Sections 2(c)(2)(C)(i) and 2(c)(2)(D)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(i), 2(c)(2)(D)(i).  Therefore, SimTradePro acted as a CPO as defined by Section 1a(11) of the Act.

154.    Section 4$o$(1)(A) and (B) of the Act, 7 U.S.C. § 6$o$(1)(A), (B), prohibits CPOs whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes, or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

155.    SimTradePro violated Section 4$o$(1)(A) and (B) of the Act, in that, while acting as a CPO by use of the mails or any means or instrumentality of interstate commerce, they directly or indirectly employed a device, scheme, or artifice to defraud  any client or participant or prospective client or participant, or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon customers by: (i) omissions and making material misrepresentations regarding IB fees that were withdrawn from customers' funds without the customers' knowledge as specified in paragraphs 85 through 120 above; and (ii) omissions and making material misrepresentations regarding the nature and details of leveraged trades in gold as specified in paragraphs 121 through 136 above.

156.    Adams and SimTradePro's other officers, employees, or agents acted within the course and scope of their employment, agency, or office with SimTradePro. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), SimTradePro is liable as a principal for each act, omission, or failure of Adams and its other officers, employees, or agents acting for SimTradePro, constituting violations of Section 4*o*(1)(A) and (B) of the Act.

157.    Adams controlled SimTradePro, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, SimTradePro to commit the acts and/or omissions alleged herein. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adams is liable for SimTradePro's violations of Section 4*o*(1)(A) and (B) of the Act.

158.    Each misrepresentation and omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4*o*(1)(A) and (B) of the Act.

## COUNT II

### Violations of 7 U.S.C. § 6*o*(1)(A) and (B)
### CTA Fraud (Both Defendants)

159.    Paragraphs 67 through 136 are re-alleged and incorporated herein by reference.

160.    Section 1a(12)(A)(i) of the Act, 7 U.S.C. § 1a(12)(A)(i), defines a CTA, in relevant part, as any person:

> for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in—. . .
> (II) any agreement, contract, or transaction described in section 2(c)(2)(C)(i) [of this title] or section 2(c)(2)(D)(i) [of this title];

161.    During the Relevant Period, SimTradePro through Adams and Associate A for compensation or profit, engaged in the business of advising others, either directly or through

publications, writings, or electronic media, as to the value of or the advisability of trading in leveraged forex and leveraged metals transactions as described in Sections 2(c)(2)(C)(i) and 2(c)(2)(D)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(i), 2(c)(2)(D)(i).  Therefore, SimTradePro acted as a CTA as defined by Section1a(12) of the Act.

162.    Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B), in relevant part, makes it unlawful for a CTA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

163.    SimTradePro violated Section 4*o*(1)(A) and (B) of the Act, in that, while acting as a CTA by use of the mails or any means or instrumentality of interstate commerce, they directly or indirectly employed a device, scheme, or artifice to defraud customers or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon customers by: (i) omissions and making material misrepresentations regarding IB fees that were withdrawn from customers' funds without the customers' knowledge as specified in paragraphs 85 through 120 above; and (ii) omissions and making material misrepresentations regarding the nature and details of leveraged trades in gold as specified in paragraphs 121 through 136 above.

164.    Adams and SimTradePro's other officers, employees, or agents acted within the course and scope of their employment, agency, or office with SimTradePro.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), SimTradePro is liable as a principal for each act, omission, or failure of Adams and its other officers, employees, or agents acting for SimTradePro, constituting violations of Section

4*o*(1)(A) and (B) of the Act.

165.    Adams controlled SimTradePro, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, SimTradePro to commit the acts and/or omissions alleged herein.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adams is liable for SimTradePro's violations of Section 4*o*(1)(A) and (B) of the Act.

166.    Each misrepresentation and omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4*o*(1)(A) and (B) of the Act.

## COUNT III

### Violations of 7 U.S.C. § 6m(1)
### CPO Registration Failure (Both Defendants)

167.    Paragraphs 39 through 66 are re-alleged and incorporated herein by reference.

168.    Subject to certain exceptions not relevant here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1), states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

169.    SimTradePro through Adams and its other agents engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in leveraged forex and leveraged metals transactions described in Sections 2(c)(2)(C)(i), and 2(c)(2)(D)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(i), 2(c)(2)(D)(i).  Therefore, SimTradePro acted as a CPO, as defined by Section1a(11) of the Act, 7 U.S.C. § 1a(11).

170.    SimTradePro, while using the mails or means of interstate commerce in connection with its business as a CPO, was not registered with the Commission as a CPO.

171.    SimTradePro was not exempt from registering as a CPO.

172.    By reason of the foregoing, SimTradePro acted as an unregistered CPO in violation of Section 4m(1) of the Act.

173.    Adams and SimTradePro's other officers, employees, or agents acted within the course and scope of their employment, agency, or office with SimTradePro.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), SimTradePro is liable as a principal for each act, omission, or failure of Adams and its other officers, employees, or agents acting for SimTradePro, constituting violations of Section 4m(1) of the Act.

174.    Adams controlled SimTradePro, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, SimTradePro to commit the acts and/or omissions alleged herein.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adams is liable for SimTradePro's violations of Section 4m(1) of the Act.

175.    Each act in violation of Section 4m(1) of the Act, including but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

### COUNT IV

**Violations of 7 U.S.C. § 6m(1)**
**CTA Registration Failure (Both Defendants)**

176.    Paragraphs 67 through 84 are re-alleged and incorporated herein by reference.

177.    Subject to certain exceptions not relevant here, Section 6m(1) of the Act, 7 U.S.C. § 6m(1), states that it shall be "unlawful for any . . . [CTA], unless registered under this chapter,

to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CTA] . . . ."

178.    SimTradePro through Adams and Associate A for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in relevant part any agreement, contract, or transaction described in Sections 2(c)(2)(C)(i), and 2(c)(2)(D)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(i), 2(c)(2)(D)(i).  Therefore, SimTradePro acted as a CTA as defined by Section 1a(12) of the Act, 7 U.S.C. § 1a(12).

179.    SimTradePro, while using the mails or means of interstate commerce in connection with its business as a CTA, was not registered with the Commission as a CTA.

180.    SimTradePro was not exempt from registering as a CTA.

181.    By reason of the foregoing, SimTradePro acted as an unregistered CTA in violation of Section 4m(1) of the Act.

182.    Adams and SimTradePro's other officers, employees, or agents acted within the course and scope of their employment, agency, or office with SimTradePro.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), SimTradePro is liable as a principal for each act, omission, or failure of Adams and its other officers, employees, or agents acting for SimTradePro, constituting violations of Section 4m(1) of the Act.

183.    Adams controlled SimTradePro, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, SimTradePro to commit the acts and/or omissions alleged herein.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adams is liable for SimTradePro's violations of Section 4m(1) of the Act.

184.     Each act in violation of Section 4m(1) of the Act, including but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

## COUNT V

### Violations of 7 U.S.C. § 6k(1)
### Failure to Register as an AP of an IB (Adams)

185.     Paragraphs 85 through 120 and 144 through 149 are re-alleged and incorporated herein by reference.

186.     In relevant part, Section 4k(1) of the Act, 7 U.S.C. § 6k(1), states that it "shall be unlawful for any person . . . to be associated with an introducing broker as a partner, officer, employee, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capacity) . . . unless such person is registered with the Commission under this chapter as an associated person . . . of such introducing broker . . . ."

187.     During the Relevant Period, Adams was associated with IB Associate A in a capacity which involved the solicitation or acceptance of customer orders for trades in leveraged forex and leveraged metals.  Therefore, Adams acted as an AP without being registered with the Commission.

188.     Each violation of Section 4k(1) of the Act, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation.

## COUNT VI

### Violations of 17 C.F.R. § 4.41(b) (2023)
### Hypothetical Results Disclosure Failure (Both Defendants)

189.     Paragraphs 39 through 120 and 137 through 143 are re-alleged and incorporated herein by reference.

190.    Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2023), prohibits any person from presenting the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest, or series of transactions in a commodity interest of a CPO or a CTA, or any principal thereof unless such performance is accompanied the hypothetical disclaimer contained in Regulation 4.41(b).

191.    Defendants violated Regulation 4.41(b) by presenting the performance results for trading strategies recommended by Defendants to customers during webinars, through their website, and through spreadsheets shown during webinars and posted on Defendants' website without the disclaimer required by Regulation 4.41(b) that the performance was based upon simulated or hypothetical trading results.

192.    Adams and SimTradePro's other officers, employees, or agents acted within the course and scope of their employment, agency, or office with SimTradePro.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), SimTradePro is liable as a principal for each act, omission, or failure of Adams and its other officers, employees, or agents acting for SimTradePro, constituting violations of Regulation 4.41(b).

193.    Adams controlled SimTradePro, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, SimTradePro to commit the acts and/or omissions alleged herein.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adams is liable for SimTradePro's violations of Regulation 4.41(b).

194.    Each act in violation of Regulation 4.41(b), including but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.    An order finding that Defendants violated Sections 4*o* and 4m of the Act, 7 U.S.C. §§ 6*o*, 6m, and Regulation 4.41(b), 17 C.F.R. § 4.41(b), and finding that Adams violated Section 4k(1) of the Act, 7 U.S.C. § 6k(1);

B.    An order of permanent injunction enjoining Defendants and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with Defendants, including any successor thereof, from:

(1) Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. §§ 6*o*, 6m, and Regulation 4.41(b), and Defendant Adams from engaging in conduct in violation of 7 U.S.C. § 6k(1);

(2) Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

(3) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023)), for their own account(s) or for any account in which Defendants have a direct or indirect interest;

(4) Having any commodity interests traded on Defendants' behalf;

(5) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(6) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(7) Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and/or

(8) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2023)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

C.     An order of permanent injunction enjoining Defendants and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with Defendants, including any successors thereof, from engaging, directly or indirectly, in conduct in violation of 7 U.S.C. §§ 6o, 6m, and Regulation 4.41(b), and Adams in conduct in violation of 7 U.S.C. § 6k(1).

D.     An order directing Defendants to pay a civil monetary penalty for each violation of the Act of not more than the amount set forth by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), title VII, Section 701, and promulgated in Regulation 143.8, 17 C.F.R. § 143.8 (2023), plus post-judgment interest;

E.      An order requiring Defendants and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

F.      An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the pool participants whose funds were received by them as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

G.      An order directing Defendants, as well as any successor thereof, to make full restitution, pursuant to such procedure as the Court may order, to every customer whose funds Defendants received, or caused another person or entity to receive, as a result of the acts and practices constituting violations of the Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

H.      An order directing that Defendants, and any successor thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to customers and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind

from at least the beginning of the Relevant Period to the date of such accounting;

I.      An order requiring Defendants and any successors thereof to pay costs and fees as

permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

J.      An order providing such other and further relief as the Court deems proper.

Dated:  September 30, 2024                          Respectfully submitted,

*s/ Harry E. Wedewer*
Harry E. Wedewer
Lead Counsel, DC Bar No. 975819
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, DC 20581
hwedewer@cftc.gov
Telephone: (202) 418-5189
Facsimile: (202) 418-5538

K. Brent Tomer
Chief Trial Attorney, NY Bar No. 4404489
Commodity Futures Trading Commission
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
ktomer@cftc.gov
Telephone: (646) 746-9738
Facsimile: (646) 746-9888

Manal Sultan
Deputy Director
Commodity Futures Trading Commission
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
msultan@cftc.gov
Telephone: (646) 746-9700
Facsimile: (646) 746-9888

Attorneys for Plaintiff
JURY TRIAL DEMANDED